UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APEX TOOL GROUP, LLC,

        Plaintiff,

                                                  CASE NO. 15-CV-10059
v.                                  HONORABLE GEORGE CARAM STEEH

WILLIAM WESSELS,

        Defendant.
_____/

OPINION AND ORDER DENYING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION (DOC. #2)

Plaintiff Apex Tool Group, LLC ("Apex" or "plaintiff") filed this action alleging that defendant William Wessels ("Wessels" or "defendant"), plaintiff's former employee, breached his employment contract and misappropriated trade secrets in connection with his current employment for plaintiff's competitor, AMT-Alfing Corporation ("Alfing"). Now before the court is plaintiff's motion for a preliminary injunction (Doc. #2). The court held a preliminary injunction hearing on July 15, 2015 taking plaintiff's motion under advisement. For the reasons that follow, plaintiff's motion will be denied.

I. BACKGROUND

Plaintiff "is one of the largest manufacturers of professional tools in the world, serving the industrial, vehicle service and assembly, aerospace, electronics, construction and serious DIY markets." (Compl. ¶ 8). From 2000 until 2003, and again from 2005 until his resignation in 2014, defendant worked as an account manager in the MVI division for plaintiff and its predecessor, Cooper Tools. (*Id.* ¶ 16). By 2011, defendant was promoted

to the position of global key account manager for plaintiff's "key account," Fiat Chrysler America ("FCA"). (*Id.* ¶ 19). He remained in this position until his resignation in late 2014.

In connection with his employment for plaintiff and its predecessor, defendant signed multiple employment agreements, including confidentiality agreements and non-solicitation agreements. When plaintiff learned that defendant was considering employment with its competitor, Alfing, in September 2014, plaintiff offered defendant an increase of $10,000 in his base compensation to encourage him to remain employed with plaintiff. In exchange, defendant reaffirmed his confidentiality and non-solicitation obligations. (*Id.* ¶ 23). Below are some of the relevant terms defendant agreed to as part of his employment with plaintiff:

      6.    **Protection of Proprietary Interests.**

        (a) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, solicit or participate in soliciting any person, company or entity to purchase or contract for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company, or entity was a customer or potential customer of the Company for such products or services and with which I had direct contact regarding such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

        (b) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which I had direct contact regarding such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

*  *  *  *

>(e) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, utilize or reveal confidential contract or relationship terms with any vendor or customer used by or served by the Company at any time during the 24 months preceding the termination of my employment or relationship with the Company.
>
>(f) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, interfere with or assist any third party in interfering with, the relationship of the Company with any vendor utilized by the Company at any time during the 24 months preceding the termination of my employment or relationship with the Company.

Doc. #1-3 at 3–4, Solicitation and Protection of Proprietary Interests Agreement.

>Defendant also agreed:
>
>At all times during and after the termination of my employment or relationship with the Company, I will not, without the Company's prior written permission, directly or indirectly for any purpose other than performance of my duties for the Company, utilize or disclose to anyone outside of the Company any Confidential Information, or any information received by the Company in confidence from or about third parties, as long as such matters remain trade secrets or confidential.

*Id.* at 2. Similarly, defendant signed a secrecy agreement agreeing not to reveal confidential or trade secret information including:

>marketing data, including analyses and projections, strategies, business plans, product plans and competitive activity data; all financial and profit information not required by law to be published; purchasing or costs data; sales data including customer lists, booking reports, current sales information, pricing, billing and other information; information considered as proprietary by Employer; or any other information pertaining to Employer or made available to Employee by Employer and identified or treated as confidential or secret.

Doc. #1-2, Secrecy Agreement.

Plaintiff filed this action alleging that defendant violated his post-employment restrictive covenants and used plaintiff's confidential information/trade secrets to improperly

-3-

compete with plaintiff on behalf of defendant's new employer, Alfing. The preliminary injunction hearing focused on actions taken by defendant that plaintiff believes violated defendant's agreements and are likely to cause irreparable harm to plaintiff. These actions are discussed in more detail below.

### A. Knowledge Of Confidential/Trade Secret Information

As an employee of plaintiff and its predecessor for approximately 15 years, defendant had access to a range of information related to FCA including "operational procedures and strategic planning; cost structures and margins; sales histories and strategies; business opportunities; contractual details; and pricing information." (Pl's. Preliminary Injunction Br. at 4, Proposed Finding Of Fact ¶ 15). Discovery to date has shown that defendant may have, upon his departure from Apex, remained in possession of Apex's pricing information related to FCA on multiple removable disk drives, despite his contractual obligation to return such information to Apex upon termination of his employment. *See* (Doc. #1-3 at 2). The parties dispute whether pricing information is confidential and/or constitutes a trade secret. Forensic examination of defendants' devices is ongoing.

### B. Resignation From Apex

Shortly after defendant accepted an increase in his base compensation to remain employed with plaintiff, defendant decided to resign from his employment with plaintiff. Defendant submitted his formal resignation to plaintiff on November 18, 2014; his last day of employment with plaintiff was December 1, 2014. According to plaintiff, when defendant decided to begin employment at Alfing, he represented that "he was entering into a formal program of on the job training to be groomed to be President of Alfing's U.S. Operations,

and that the first twelve months of his employment with Alfing would be devoted to learning the business of all of the companies under the Alfing N.A. umbrella." (Pl's. Preliminary Injunction Br. at 6, Proposed Finding Of Fact ¶ 23). In other words, plaintiff contends that defendant represented that his client contact would be minimal during his first year at Alfing. Plaintiff later learned that defendant was a sales manager at Alfing. (*Id.* at 7, ¶ 26). Defendant, however, contends that plaintiff knew that defendant would have client contact, and, in any event, he revealed his "sales manager" title to plaintiff on December 8, 2014. (Def.'s. Preliminary Injunction Br. at 7–8, Proposed Finding Of Fact ¶ 8).

### C. Defendant Accesses Pricing Files

In his last month of employment at Apex, defendant connected multiple personal storage devices to his Apex computer. (Pl's. Ex. 1, McCollough Aff.). According to defendant, "he was working with other Apex employees to transfer files and information to them so there could be a smooth transition." (Def.'s. Preliminary Injunction Br. at 14, Proposed Finding Of Fact ¶ 28). On his final day of employment, defendant accessed plaintiff's customer pricing and operational files. (*Id.*). A forensic report determined that defendant connected 17 devices to his Alfing computer after he left Apex, and that multiple files were Apex files potentially related to FCA pricing information. (*Id.*). As previously stated, the forensic examination is ongoing.

### D. Defendant E-Mails Alfing President While Employed By Apex

While he was still employed by plaintiff, on November 25, 2014, defendant emailed Alfing's president, Manfred Egerer, about an opportunity at FCA's Toluca, Mexico location. (Pl's. Ex. 134, 11/25/14 e-mail). Defendant told Egerer, "[n]eed to get to Carlos Garza who is the maintenance manager at Toluca assembly plant and show him the AMT wireless

tools. This opportunity is real and we need to be PFCS certified in order to win this business." (*Id.*). Egerer responded to defendant, "Thank you[.] Do you have his contact information?" (*Id.*).

In his position with plaintiff, defendant was privy to "certain portions of the FCA MP Program at its Toluca facility." (Pl's. Ex. 142 ¶ 11, Thackray Aff.). Indeed, defendant "had exposure to confidential information about [Apex]'s sales history and strategy for providing such products to FCA, the performance of [Apex]'s wireless tools used by [Apex], and the pricing of such tools." (*Id.* ¶ 12).

At the preliminary injunction hearing, counsel for plaintiff stated that, currently, no project is pending for bidding at FCA's Toluca location. In fact, plaintiff's counsel stated that he did not know when (or if) there would be a project for wireless tools open for bidding at FCA's Toluca location. Plaintiff anticipates a project in the future (sometime in 2015) totaling approximately $250,000. (Pl's. Ex. 147, Goodin Aff. ¶ 33).

### E. Defendant Meets With Brian Kelly After Starting At Alfing

On December 15, 2014, as a new employee at Alfing, defendant met with Brian Kelly, a decision maker for FCA, to discuss a rivnut fastening device used in the motor vehicle assembly process. The meeting was arranged by Kelly. (Def's. Ex. 556 ¶ 6, Kelly Aff.). This discussion occurred during the same time plaintiff was working to submit a proposal to Chrysler for a project relating to upsizing door hinges in three assembly plants. (Def's. Ex. 518 ¶ 5, Thackray Aff.). FCA's ultimate goal was to increase the torque requirement on a nutrunner tool that was, at the time, supplied by Apex; however, FCA ultimately decided not to change the torque requirement and there was never a project open for bid. (Def's. Ex. 556 ¶ 6, Kelly Aff.).

The proposal plaintiff was going to submit to FCA involved replacing the existing tool with a different nutrunner. Like a rivnut tool, a nutrunner is also a fastening device. However, rivnuts are not similar to nutrunners. Brian Kelly's affidavit states that, "[a] rivnut tool would never be used in the place of a nutrunner, and vice versa; they are not similar." (Def's. Ex. 556 ¶ 5, Kelly Aff.). And specifically as it relates to his December 15 meeting with defendant, Kelly stated: "Mr. Wessels told me that he could not compete against Apex and reminded me that Alfing is not certified by FCA to sell it products for the assembly division. Accordingly, Alfing never bid on the subject tool, nor could it." (*Id.* ¶ 6)

F. Defendant's Involvement In Comau Saltillo Project

In 2014, plaintiff was working on submitting a proposal through Comau, a third party integrator owned by FCA, for a FCA project involving multi-spindles (the "Comau Saltillo Project"). An internal e-mail was sent to defendant at Apex in October 2014, when he was still employed at Apex, asking him to provide feedback on the proposal. (Pl's. Ex. 119). Defendant responded to the e-mail:

> [Alfing] is also quoting this project to Comau, I am also thinking that [Alfing] might be quoting to Chrysler direct? If your contacts are telling you [Alfing] is not quoting direct to Chrysler then I would add 5% points to the quote.

(*Id.*).

Apex knew in November 2014, while defendant was still employed at Apex, that Alfing was also submitting a competing bid on the Comau Saltillo Project. (Def's. Ex. 553, E-mail From Kevin Lee to Jose Soto). Moreover, by December 10, 2014, Apex knew that it was going to be awarded the Comau Saltillo Project, but that the formal award was delayed for "typical industry issues." (Def.'s. Preliminary Injunction Br. at 8, Proposed

Finding Of Fact ¶ 14). Eventually, the project was formally awarded to Apex in March 2015.

However, before the project was awarded to Apex, in February 2015, defendant and John Gartner, an Alfing employee, participated in a PowerPoint presentation at Comau's Royal Oak, Michigan location. (Pl's. Ex. 139, Def's. Dep. Tr. 93:9–14). The presentation focused on what Alfing had to offer Comau. (*Id.* at 93:25–94:1). Plaintiff contends that defendant was responsible for setting this meeting, and, that products competitive with plaintiff's products were discussed (nutrunners). In fact, plaintiff says that defendant was attempting to solicit Comau for the Comau Saltillo Project. Defendant says that Gartner was responsible for setting the meeting. Moreover, defendant avers that no competitive products were discussed, just a general overview of what Alfing had to offer to Comau in the future. Following the meeting, defendant sent an e-mail to three individuals at Comau thanking them for their time and the possibility of working with Comau in the future. (Pl's. Ex. 124, Def's. E-mail To Comau).

### G. Goeke Project

Also in February 2015, Alfing's president accidently sent an e-mail to defendant's Apex e-mail address seeking an update on a roof assembly project where Alfing is teaming up with Goeke to provide sunroofs to FCA. (Pl's. Ex. 129, Egerer E-mail To Def.). The e-mail included a forwarded e-mail chain. In one of the e-mails (a January 2015 e-mail), an Alfing representative e-mailed Goeke asking for a film about the sunroof installation to help with the project. Plaintiff contends that Apex's spindles are seen in the film. Apex, however, is unaware of any projects that would be competitive with Alfing's/Goeke's sunroof project. In addition, defendant testified at his deposition that he has not been

involved in any sunroof project with Goeke since starting for Alfing and he never saw the subject e-mail sent to his former e-mail account.

### H. GME North America Project

During his employment with plaintiff, defendant was involved in partnering with Comau in Italy on multiple projects, including the Global Medium Engine ("GME") project. *See* (Pl's. Ex. 127, E-mail Chain Discussing GME Italy). Defendant "was directly involved in all aspects of [Apex]'s sales process related to the first phase of the FCA GME [Italy] project[.]" (Pl's. Ex. 147, Goodin Aff. ¶ 25). "As a result, [defendant] is very aware of [Apex]'s technical strengths and weaknesses related to the GME Main Line — Termoli, as well as [Apex]'s commercial strategies." (*Id.* ¶ 29).

In April 2015, Alfing submitted a proposal to Comau for the GME North America project. (Pl's. Ex. 125). Defendant sent the proposal directly to Richard Warner at Comau in an e-mail stating, "John Gartner had to leave the office and he wanted me to send this to you. If you have any questions, please contact John Gartner directly." (*Id.*). Plaintiff contends that defendant's involvement in the GME North America project violates his post-restrictive covenants based on his prior involvement in the GME-Italy project while employed at Apex. Defendant responds that he is not involved in the GME North America project (he only sent the e-mail for Gartner because Gartner was out of the office), and, in any event, the GME North America project has nothing to do with the GME Italy project that defendant was involved in at Apex. The GME North America project has not yet been awarded by Comau. (Pl's. Ex. 147, Goodin Aff. ¶ 31).

I. Request For Preliminary Inunction

Based on the above facts, plaintiff seeks a preliminary injunction to prevent defendant from violating his post-employment restrictive covenants and using plaintiff's confidential information and trade secrets. Plaintiff is subject to the restrictive covenants for four more months. The court has reviewed the parties' papers and has had the opportunity to conduct a preliminary injunction hearing. The motion is now ready for decision.

III. LEGAL STANDARD

It is within the district court's discretion to issue a preliminary injunction. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996). "[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.' " *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citation omitted).

The court considers four factors in deciding whether to issue a preliminary injunction: (1) "whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (internal quotation marks omitted). Each of the factors should "be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir.

2014) (citation omitted). However, the likelihood of success on the merits and irreparable harm factors must weigh in favor of relief for an injunction to issue. *Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 949 (E.D. Mich. 2008) (citation omitted). The Sixth Circuit has explained, "[a] district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997) (citation omitted). " '[I]t is generally useful for the district court to analyze all four of the preliminary injunction factors, especially since [the Sixth Circuit's] analysis of one of the factors may differ somewhat from the district court's.' " *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007) (citation omitted).

## IV. ANALYSIS

The court discusses and balances each of the four preliminary injunction factors below.

### A. Likelihood Of Success On The Merits

Plaintiff's complaint is in two counts: Count One- Breach of Contract; Count Two- Violations of Michigan's Uniform Trade Secrets Act ("MUTSA"). The court analyzes plaintiff's likelihood of success on the merits as it relates to each count.

#### 1. The breach of contract claim (Count One)

To succeed on its breach of contract claim, plaintiff must show by a preponderance of the evidence that "(1) there was a contract (2) which the other party breached (3) thereby

-11-

resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).[1]

There is no dispute that there was a valid contract (the post-employment restrictive covenants defendant agreed to abide by as a condition of his employment at Apex). Initially, the court must determine whether the non-compete/non-solicitation and secrecy agreements defendant signed are reasonable, and, therefore, enforceable. Under Michigan law, such agreements are enforceable if they (1) are reasonably drawn as to duration, geographical scope, and line of business; and (2) protect the legitimate business interest of the party seeking enforcement. *Kelly Services, Inc. v. Noretto*, 495 F. Supp. 2d 645, 656–57 (E.D. Mich. 2007) (citation omitted). Here, the agreements are narrow and limited in scope. There is no geographical or line of business restrictions. Essentially, defendant is precluded for a one-year period from directly or indirectly competing with plaintiff and/or soliciting companies in projects that are competitive with plaintiff, if defendant had direct contact with the companies in his last 24-months of employment with plaintiff. Moreover, defendant is precluded from using plaintiff's confidential information and/or trade secrets. These are reasonable restrictions. The court also notes that, at this stage, defendant is not challenging the agreements on the basis that they are not enforceable.

Next, the court must determine whether defendant's actions, described above, constitute a breach of his post-employment restrictive covenants. This, in turn, depends

---

[1] The parties do not dispute that Michigan law applies to the breach of contract claim in this diversity action. In diversity cases, the court applies Michigan substantive law. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607–08 (6th Cir. 2012).

-12-

on a determination of several factual disagreements that can be resolved only after a full presentation of the evidence at trial. For example, the parties have a threshold disagreement over which specific Apex customers defendant is precluded from doing business with. Moreover, there are several legal questions that will be better resolved based on a comprehensive development of the evidence as a whole. This is because those issues are mixed questions of law and fact. For instance, the court is not in a position to determine whether defendant used confidential information to compete with plaintiff and/or solicit plaintiff's customers when it is not entirely clear what information defendant actually had in his possession while employed at Alfing. In other words, the record is not yet sufficiently developed to properly analyze plaintiff's likelihood of success on its breach of contract claim. The better course of action is to decide these issues after all of the evidence is submitted.

There is an additional roadblock plaintiff has not overcome – damages. Michigan law requires proof of damages resulting from the breach of contract. *Regency Realty Grp., Inc. v. Michaels Stores, Inc.*, No., 2013 WL 3936399, at *12 (E.D. Mich. July 30, 2013) (citing *Pawlak v. Redox Corp.*, 453 N.W.2d 304 (Mich. Ct. App. 1990)). In plaintiff's proposed conclusions of law addressing the breach of contract claim, it does not mention damages at all. *See* (Pl's. Preliminary Injunction Br. at 16–19). The only mention of damages is in plaintiff's argument that it will suffer irreparable harm because of a loss of "customer goodwill." (*Id.* at 22–23, ¶¶ 92–94). Aside from this conclusory statement, plaintiff does nothing to show how its customer goodwill has been affected by defendant's actions.

The evidence submitted in support of plaintiff's motion for preliminary injunction does not establish a loss of goodwill or competitive advantage. Plaintiff has not pointed to any lost customers or projects as a result of defendant's actions. One of the ways plaintiff says defendant has violated the non-solicitation agreement is that he attempted to solicit Comau in February 2015 for the Comau Saltillo Project. However, plaintiff won that project. In fact, plaintiff unofficially knew in December 2014 that it won the project, before defendant allegedly tried to compete with plaintiff for the project in February 2015. Likewise, plaintiff has not pointed to any project defendant was involved in that resulted in an award of the project to Alfing instead of Apex as a result of defendant's violation of his restrictive covenants. Plaintiff has failed in its proofs at this juncture to establish that any actions taken by defendant in violation of his restrictive covenants has had any negative impact on the company, let alone its good will or competitive advantage.

The court concludes that plaintiff has not established a likelihood of success on its breach of contract claim.

## 2. The MUTSA claim (Count Two)

As to the claim under the Michigan Uniform Trade Secrets Act, plaintiff argues that defendant's use of plaintiff's customer contracts, cost structures and margins, product development information, sales histories and strategies, business opportunities and customer, vending and pricing information is improper. Based on defendant's use of storage devices to access the above information before he terminated his employment with plaintiff, plaintiff argues that defendant is improperly in possession of its trade secrets and using them for his new employer, Alfing.

To succeed in a claim under the MUTSA, plaintiff must establish the misappropriation of a trade secret, as defined by Michigan statute. Mich. Comp. Laws § 445.1902(d). It is the plaintiff's burden of "pleading and proving the specific nature of the trade secrets." *Wilson v. Continental Dev. Co.*, 112 F.Supp.2d 648, 662 (W.D. Mich. 1999).

It is difficult to determine at this stage in the case whether plaintiff will likely prevail on its MUTSA claim. There is conflicting testimony whether the pricing information defendant allegedly possessed is confidential. In addition, it is not entirely clear what information defendant actually possessed. The forensic analysis of defendant's computer and storage devices is ongoing and will reveal the content of the files retained by defendant. To date, the only evidence submitted is a breakdown of the file names on defendant's devices. Standing alone, the file names are not helpful. When the actual files are proffered as evidence, the court will be better suited to determine whether the content constitutes a trade secret under Mich. Comp. Laws § 445.1902(d).

In sum, the likelihood of success on the merits factor does not support the issuance of a preliminary injunction.

### B. Irreparable Harm

Next, the court considers whether plaintiff will suffer irreparable harm absent the issuance of a preliminary injunction. "To be granted an injunction, the 'plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury.'" *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002). Plaintiff has failed to meet its burden in establishing actual irreparable harm or the existence of an actual threat of such injury. Standing alone, this balances strongly against the issuance of a preliminary injunction. *See Hacker v. Federal Bureau of Prisons*,

No. 06-12425, 2006 WL 2559792, at *8 (E.D. Mich. Sept. 1, 2006) (finding the second factor alone dispositive of plaintiff's preliminary injunction motion). " 'A finding of irreparable harm is the single most important prerequisite that the Court must examine when ruling upon a motion for a preliminary injunction.' " *Nexteer Automotive Corp. v. Korea Delphi Automotive Sys. Corp.*, No. 13-15189, 2014 WL 562264, at *8 (E.D. Mich. Feb. 13, 2014) (quoting *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 771 (E.D. Mich. 2003)); *see also Mount Clemens Inv. Grp., L.L.C. v. Borman's Inc.*, No. 10-12679, 2010 WL 3998095, at *3 (E.D. Mich. Oct. 12, 2012) (reasoning that district court need not evaluate other factors where failure to demonstrate irreparable harm is fatal to plaintiff's motion).

The Sixth Circuit has held that the loss of customer goodwill and competitive position may constitute irreparable harm. *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013). However, as explained above, plaintiff has failed to establish how any of defendant's actions harmed its customer goodwill and competitive position in the past, let alone that any such actions are likely to lead to immediate irreparable harm in the future. Although irreparable harm "may be possible at some point in time," plaintiff "has not established that the injury is *likely*." *NDSL, Inc. v. Patnoude*, 914 F.Supp.2d 885, 899 (W.D. Mich. 2012) (emphasis in original). At best, plaintiff has established past harm. As defendant points out, he is no longer in possession of the storage devices allegedly containing Apex's pricing information because they have been turned over for forensic examination. Defendant is no longer in possession of his Alfing laptop. Without access to this information, it is unlikely that plaintiff will suffer irreparable harm in the immediate future.

Moreover, a period of approximately four months remains on defendant's post-employment restrictive covenants. Plaintiff has not pointed to any projects that are pending or any that are forthcoming in the near future (in the next four months) that defendant is involved with that are competitive with plaintiff. Given that defendant is not in possession of the information he allegedly would use to compete with plaintiff in a competitive project arising in the next four months, it is difficult to surmise that it is *likely* that plaintiff will suffer immediate irreparable harm in the future. Any alleged wrongful conduct has already occurred in the past, but there is nothing to suggest that it is likely to occur in the future.

Finally, it is well settled that a plaintiff does not suffer irreparable injury if the injury if fully compensable by money damages. *Overstreet v. Lexington-Fayette Urban Cnty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citation omitted). Plaintiff has failed to show that its alleged loss of customer goodwill and competitive advantage cannot be adequately compensated by money damages. This court has explained, "[w]hether or not the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Nexteer Automotive Corp.*, 2014 WL 562264, at *10. Here, plaintiff has failed to show any injury to its overall economic well-being. Plaintiff has not shown that it has lost any projects or customers, nor has it shown that this is likely to occur in the next four months. In sum, "[i]t appears to the court that [plaintiff] is a substantial company and would not be driven out of business in the absence of injunctive protection. Under these circumstances, [plaintiff] has failed to show irreparable harm in as much as . . . a possible loss of customer goodwill does not threaten complete destruction of its business." *Id.*

For these reasons, this factor weighs against a preliminary injunction.[2]

### C. Substantial Harm to Others

The next factor the court considers is whether issuance of an injunction would cause substantial harm to others. This factor is not particularly relevant because the court's decision will not have an impact on anyone besides the parties to this litigation. *Patio Enclosures, Inc.*, 39 F. App'x at 970.

### D. Public Interest

Plaintiff argues that "[t]he public interest in protecting confidential information and enforcing valid employment agreements justifies preliminary injunctive relief." (Pl's. Preliminary Injunction Br. at 25, Proposed Conclusion of Law ¶ 102). While it is true that the public has a general interest in seeing that reasonable non-compete agreements are enforced, the public also has an interest in "allowing a successful salesman to continue performing his trade." *Id. See Patio Enclosures, Inc.*, 39 F. App'x at 970. This factor does not weigh in favor of either party.

---

[2] To the extent that plaintiff argues that its agreement with defendant presumes that a violation of the agreement constitutes irreparable harm, this provision is irrelevant. "Actual injury usually is not presumed, however; it must be proved." *Patio Enclosures, Inc.*, 39 F. App'x at 970 (citation omitted); *see also Nexteer Automotive Corp.*, 2014 WL 562264, at *9 ("[N]umerous courts have held that such a contractual provision does not alter the court's obligation to analyze whether the party seeking an injunction has proven irreparable harm.") (citations omitted).

## V. CONCLUSION

In sum, when balancing the preliminary injunction factors, the court is not convinced that this is an extraordinary case necessitating a preliminary inunction. Assuming a likelihood of success on the merits of its claims, the fact that plaintiff is unlikely to suffer immediate irreparable harm weighs heavily against issuance of a preliminary injunction. Plaintiff's motion for preliminary inunction is, therefore, DENIED.[3]

IT IS SO ORDERED.

Dated:  August 4, 2015

                                      s/George Caram Steeh
                                      GEORGE CARAM STEEH
                                      UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 4, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---

[3] Defendant moves to strike Kenneth Goodin's supplemental affidavit (Doc. #51, Pl's. Ex. 147), or, in the alternative, to allow defendant to file a supplemental affidavit. (Doc. #53). Goodin's supplemental affidavit does not affect the outcome of the motion before the court. Therefore, defendant's motion to strike is DENIED AS MOOT.